UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

CLAUDE ZAIN McCOLLUM,

        Plaintiff,

v.                                  Case No. 1:08-CV-96

RODNEY BAHL, et al.,                HON. GORDON J. QUIST

        Defendants.

_____/

## OPINION

> The [investigating officer] advised the incident happened between 8:30-8:45 a.[m]. From the above time chart, the suspect was visible on camera 7 during that time. Unless the times given to me by the [investigating officer] for the card swipe or the frames chosen by the [investigating officer] as in/out [were inaccurate] the suspect did not commit the crime.

In all likelihood, had the jury in the trial of Plaintiff, Claude Zain McCollum ("McCollum"), for the sexual assault and murder of Carolyn Kronenberg heard this statement or testimony from its author, Detective Sergeant James Young, regarding his work on video surveillance tapes and his resulting conclusions about McCollum's innocence, it would not have convicted McCollum because, as it turns out, the information furnished to Detective Young was accurate. In fact, the prosecution's case was built upon that information. For reasons that are in dispute, and even though Detective Young shared his conclusion with the lead investigating officer months prior to the trial, the jury never heard Detective Young's conclusion that McCollum was innocent because McCollum was visible on videotape surveillance in an entirely different building when the murder occurred. Consequently, McCollum was convicted and was incarcerated for almost two years before he was released based, in part, upon the same videotape evidence cited by Detective Young.

The issue before this Court is whether Rodney Bahl, the sole defendant remaining in this case, is entitled to summary judgment on McCollum's claims under 42 U.S.C. § 1983 and state law.[1] For the reasons set forth below, the Court will grant Defendant Bahl's motion with regard to some claims but deny it with regard to others.

## I. FACTS

For purposes of the instant motion, the facts, where in dispute, are construed in a light most favorable to McCollum, as the non-moving party.

On Sunday, January 23, 2005, at approximately 8:45 a.m., Carolyn Kronenberg, a professor at Lansing Community College ("LCC"), was found brutally murdered and sexually assaulted in the Student Personnel Services ("SPS") Building on LCC's campus in downtown Lansing, Michigan, where she had been preparing to teach a class. The LCC Police Department immediately began an investigation and assigned Defendant Detective Sergeant Bahl as the lead investigator. John Imeson, the Chief of the LCC Police Department, was involved in the investigation to a limited extent, but the day-to-day handling of the investigation fell to Detective Bahl.

### Evidence Regarding the Time of the Murder

The evidence obtained early in the investigation established that the murder occurred that morning between 8:30 a.m. and 8:42 a.m. This time frame was based upon several pieces of evidence. First, at 7:33 a.m., Kronenberg called LCC to have the doors to the SPS Building opened so that she could bring some materials in for her class that was to begin at 9:00 a.m. Second, LCC Officer McGraw, as shown by radio logs and Officer McGraw's testimony, began opening the SPS Building around 7:40-7:44 a.m. Third, at about 8:03 a.m., Officer McGraw returned to the Gannon

---

[1] In a number of previous orders, the Court dismissed all other named Defendants either on stipulation or pursuant to dispositive motions. The Court's latest order, entered on March 10, 2010, granted summary judgment to Defendants John Imeson and Lansing Community College.

Vocational Building, from where he was previously dispatched, and left again around 8:23 a.m. to pick up a newspaper in front of the SPS Building. While picking up the newspaper, Officer McGraw saw Kronenberg unloading items from the rear of her car in front of the SPS Building. Fourth, Officer McGraw returned to the Gannon Vocational Building around 8:29 a.m. Fifth, at around 8:42 a.m., the first student arrived for Kronenberg's class and found Kronenberg on the floor of the classroom. Finally, Officer McGraw responded to an emergency call and went to Kronenberg's classroom, where he recognized Kronenberg as the woman he saw fifteen minutes earlier. Once the 8:30-8:42 time frame was established, it was never changed during the course of the investigation or the prosecution.

### McCollum's "Confession"

The investigation focused on the theory that the person who killed Kronenberg may have walked to the SPS Building from the Technology and Learning Center ("TLC") Building, which was located adjacent to the to the SPS Building. Consequently, officers began looking at students who had been in the TLC Building, and they obtained information on students who had checked into and out of the computer lab in the TLC Building that morning. This information was based upon records of "star card" swipes.[2] Bahl and other officers then began interviewing students and others, including McCollum, whose star card swipes showed that they were in the computer lab the morning of the murder. McCollum's star card records showed that he left the TLC computer lab at 7:22 a.m. and reentered at 9:41 a.m. Bahl was familiar with McCollum from prior encounters and knew that he was a homeless student who often loitered around and slept on campus. Bahl also knew that another officer had reported McCollum as having appeared mentally unstable in a prior incident.

---

[2]A "star card" is a personal identification/access card that LCC issues to students.

On January 25, 2005, Bahl located McCollum and asked him to go to the Gannon Building to be interviewed. McCollum agreed to go with Bahl, and Bahl interrogated McCollum in a room for about 45 minutes. McCollum told Bahl that on January 23 he had been in the computer lab and that at sometime around 7:00 a.m. he left and sat in a chair near the southwest doors of the TLC building. He said that he fell asleep and woke up around 9:30 a.m. McCollum also said that after he left the TLC Building he boarded a city bus, where he overheard a conversation between the bus driver and a passenger about an LCC instructor who had been murdered. McCollum said that he did not commit any crime. Bahl told McCollum that an LCC professor had been raped and murdered, and he suggested how it might have occurred. (McCollum Aff. ¶¶ 6, 7.) McCollum told Bahl that the only way he could have killed the instructor was if he did it while sleep walking.

At the conclusion of his questioning, Bahl transported McCollum to the City of Lansing Police Department for additional questioning. Detective Bruce Lankheet conducted the questioning, and Bahl sat in the room. During the recorded portion of the interview, McCollum told the officers that he was not in the SPS Building on January 23. Detective Lankheet asked McCollum hypothetical questions about how he might have committed the murder by sleepwalking. Many of the details McCollum shared were based upon information Bahl had provided during the earlier interview at LCC. Several of the details McCollum provided were inconsistent with the actual facts at the crime scene. Based upon McCollum's statements and the fact that he had checked out of the computer lab during the time of the murder, the police secured a criminal complaint and warrant against McCollum for the Kronenberg murder and sexual assault. McCollum was then arrested and jailed without bond pending further proceedings. Although the incident involved a brutal sexual assault and murder with blood at the crime scene, no physical evidence connected McCollum to the murder.

### The Video Surveillance

Video surveillance was obtained from the TLC Building to look for additional evidence. The surveillance tape was multiplexed, i.e., frames from seven different cameras were recorded onto one tape, and the video was not recorded with date or time stamps. The original tape was essentially useless for the investigation. At the suggestion of Chief Imeson, Bahl arranged to have the Technical Services Unit of the Michigan State Police ("MSP") analyze the tape. On or about February 4, 2005, an LCC officer delivered a videotape to the Technical Services Unit for review and to have still prints made and enhance poor quality frames. Detective Sergeant James Young, an MSP video technician, performed this work. Detective Young initially made three tapes, each containing a different period of time, and gave them to Bahl to allow Bahl to compare the tapes with McCollum's star card swipe times. On February 22, 2005, Bahl returned the videotapes to Young, and Bahl advised Young of the frames in which he was interested, being the frames in which McCollum was seen swiping his starcard at the computer lab at 7:22 a.m., when he exited, and 9:41 a.m., when he reentered. Bahl advised Detective Young that the crime occurred between 8:30 a.m. and 8:45 a.m. Although Bahl had initially requested Detective Young to demultiplex the tape, i.e., separate the frames of the video out for each of the seven cameras, for the entire 24-hour period, Detective Young obtained approval from the assistant prosecutor, Eric Matwiejczyk, to limit his work to the time between McCollum's star card swipes of 7:22 a.m. and 9:41 a.m.

In addition to demultiplexing the videotapes, Detective Young advised Bahl that he could possibly prepare an analysis of the times that McCollum was visible on camera. (Young Dep. at 124, 130-31.) Because the surveillance video was recorded in elapsed time, Detective Young prepared a time chart by correlating the frames on the video with the starcard swipe times and using mathematical calculations to extrapolate the video to real time. He described his work as follows:

> What happened with this is as soon as Bahl told me, Detective Bahl told me that he had a time swipe of 7:22 and 9:41, it made sense to me, because I deal with video all day every day, that if you have a time of 7:22 and 9:41 and you can say that those times are accurate, it's possible that even though this is recorded in time-lapse mode, you may be able to do a ratio to try to figure out what happened during the time between 7:22 and 9:41.

(*Id.* at 112-13.)  Although Detective Young had not previously done work similar to this, (*id.* at 113), the task was relatively straightforward, as he used "very old and very simple mathematics to solve an equation." (*Id.* at 121.)

Based upon his results, Detective Young concluded that McCollum was visible on Camera 7 in the TLC Building during the entire time Bahl had identified as the murder time frame.  He thus determined that unless the times Bahl identified for the card swipes or the frames Bahl chose were inaccurate, McCollum did not commit the crime.  Detective Young had not expected that his work would show the suspect in the TLC Building during the entire murder time frame.

On March 28, 2005, Bahl met with Detective Young at Young's office to discuss the videotape work.  During this meeting Detective Young and Bahl discussed time frames and Young's report and his opinions and conclusions that McCollum could be seen on the tape a majority of the time, including the time of the murder.  (Young Dep. at 158-59.)  Detective Young believes that he gave a copy of his March 28, 2005, report to Bahl, and he is positive that he gave Bahl a copy of the Excel spreadsheet, which contains the table of times included in Detective Young's March 28 report.  (*Id.* at 158-61.)  Detective Young also provided Bahl with copies of the seven videotapes with the tape times and counter-times of each tape written on the labels.  During the meeting, Bahl immediately tried to pick apart Detective Young's analysis by pointing to times where he thought the murder could have happened. (*Id.* at 161-69.)  Detective Young was 100% certain in his opinion that McCollum was in the TLC lobby during the entire time the murder could have occurred.  (*Id.* at 115.)

On April 13, 2005, Bahl prepared a report describing the contents of each of the seven tapes that Detective Young prepared. Even though Bahl stated that "[t]here is no time and date stamp on the video so it is unknown what time it is and how long he is in view or out of view of the cameras," Bahl did not mention Detective Young's work or the starcard swipe times as providing reference points for the video. Bahl gave David Merchant, McCollum's initial defense attorney, three tapes, none of which was prepared by Detective Young. (Merchant Dep. at 199.) In separate conversations, Bahl and Matwiejczyk each told Merchant that they were unable to break down the tapes into separate tapes or do anything else with them. (*Id.* at 100, 154-55, 193.) Merchant was never told about Detective Young's work or that the Michigan State Police had been asked to break down the video. (*Id.* at 162, 197.)

McCollum's preliminary examination was held on July 7, 2005. During the preliminary examination, Bahl testified about McCollum's confession and how McCollum's statement that the perpetrator would not have had much time to commit the crime fit with Bahl's theory of the case and the murder time frame. During his testimony, Bahl did not mention that he supplied the crime scene details to McCollum, nor did he mention Detective Young's conclusion in his March 28, 2005, report. Furthermore, as mentioned above, Merchant was unaware of Detective Young's report and had not received copies of the tapes that Detective Young made and furnished to Bahl. Following the preliminary examination, McCollum was bound over for trial in the circuit court.

At some point after the preliminary examination, attorney David Lee Taylor replaced Merchant as McCollum's counsel. Taylor received copies of the tapes Young had prepared, including the tape from Camera 7, which shows McCollum sitting in the lobby of the TLC

Building.[3]  (Taylor Dep. at 384-85.)  Matwiejczyk and Bahl told Taylor that Detective Young had looked at the tapes and could not make sense out of them as far as times.  (*Id.* at 389.)  Taylor was not told of Detective Young's March 25, 2005, report, the Excel spreadsheet, or conclusion that McCollum was not guilty.

### The Trial

McCollum's trial was held from January 17, 2006, until February 14, 2006, at the conclusion of which the jury returned verdicts of guilty on both the murder and criminal sexual conduct charges.  Although he had not previously provided a copy of his March 28, 2005, report to the prosecutor prior to trial, when Detective Young appeared and met with Bahl, Matwiejczyk, and another assistant prosecutor prior to testifying, he had his report with him and gave a copy to Matwiejczyk.  Matwiejczyk instructed the other assistant prosecutor, Marie Wolfe, to make a copy for defense counsel.  Matwiejczyk and Wolfe claim that they gave the report to Taylor during the break before Young took the stand and saw him read it.  Taylor denies receiving the report at any point during the trial and claims that he did not know about it until long after the trial.  McCollum was sentenced to a term of life imprisonment on April 12, 2006.

### The Dénouement

McCollum appealed his conviction to the Michigan Court of Appeals.  Shortly before oral argument, however, McCollum's appellate counsel and the Ingham County Prosecutor filed a joint motion to vacate the conviction and remand the matter back to the trial court.  The motion was based

---

[3]There is some question about when Taylor received the videotapes and from whom he received them.  Taylor testified that he received them from Merchant and that Merchant told him that they provided no useful information. (Taylor Dep. at 388.)  Merchant claimed that he never received copies of the tapes that Detective Young made. (Merchant Dep. at 199.)  While it is undisputed that Taylor received at least six of the tapes and that he had the tape showing McCollum in the lobby, McCollum has shown that the copies Taylor was given omitted critical information that Detective Young had included on the labels of the tapes he furnished to Bahl.  (Pl.'s Resp. Imeson's and LCC's Mot. Partial Summ. J. Ex. 18.)

upon new evidence indicating that a third party, Matthew Macon, confessed to the crime, as well as the videotape evidence showing that McCollum was in the TLC Building at the time of the murder. The court of appeals granted the motion, vacated the conviction, and remanded the matter back to the trial court. On October 24, 2007, all charges against McCollum were dismissed. Thereafter, McCollum filed the instant case.

## II. MOTION STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. DISCUSSION

### A. Bahl's Motion for Summary Judgment

Bahl contends that he is entitled to summary judgment both on McCollum's federal claims under 42 U.S.C. § 1983 and on his state law claims.

#### 1. Section 1983 Claims

At the outset, the Court finds it helpful to identify the specific claims McCollum alleges under § 1983. Based upon its review of the Second Amended Complaint, the Court determines that

McCollum alleges three types or species of claims. First, he alleges that Bahl violated his due process rights as set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), by failing to turn over exculpatory evidence. The specific *Brady* violations are based upon Bahl's failure to turn over or disclose: (1) Detective Young's March 28, 2005, report, including any of the oral information that Bahl learned in his March 28, 2005, meeting with Detective Young; (2) information on the labels of the videotapes produced by Detective Young omitted from the labels of the tapes Bahl made and furnished to the prosecutor and defense counsel; and (3) the true murder time frame, which was different than the time frame the prosecution presented at trial. Second, McCollum alleges that Bahl violated his right to due process by fabricating evidence against him. The particular allegations of this claim are that Bahl fabricated McCollum's so-called confession by feeding McCollum details of the crime that McCollum repeated in the subsequent interrogation by Detective Lankheet and that Bahl fabricated evidence that McCollum's clothes contained purple fibers matching fibers from the sweater Kronenberg was wearing when she was murdered.[4] Finally, McCollum alleges that Bahl unlawfully continued McCollum's detention without probable cause in violation of the Fourth Amendment after learning of Detective Young's conclusion that McCollum was innocent. (2d Am. Compl. ¶¶ 111, 202.)

     **a.**      ***Brady* Violation**

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97. In order to comply with *Brady*, "'the individual prosecutor has a

---

[4]Although McCollum couches Bahl's acts regarding the purple fiber evidence in terms of "mishandling" rather than "fabricating," the Court will analyze the purple fiber evidence under the rubric of fabrication.

duty to learn of any favorable evidence known to the others acting on the government's behalf in th[e] case, including the police.'" *Strickler v. Greene*, 527 U.S. 263, 281, 119 S. Ct. 1936, 1948 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567 (1995)). A plaintiff establishes a *Brady* violation by showing "that (1) the evidence at issue is favorable to him; (2) the State, either willfully or inadvertently, suppressed that evidence; and (3) prejudice ensued." *Harbison v. Bell*, 408 F.3d 823, 830 (6th Cir. 2005) (citing *Strickler*, 527 U.S. at 282-82, 119 S. Ct. at 1948). A violation is established only where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994) (internal quotations and citations omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566. However, there is no *Brady* violation where the defendant was "aware of the essential facts that would enable him to take advantage of the exculpatory evidence." *Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004) (internal quotations omitted). Moreover, *Brady* does not require the government to turn over all exculpatory evidence if the evidence in question is available to the defendant from other sources and he was aware of the essential facts needed to obtain the evidence. *Id.* at 610-11.

In general, the responsibility of disclosing exculpatory evidence to the defense falls upon the prosecutor. *See Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010). In *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009), the Sixth Circuit observed that "[t]o the extent that *Brady* imposes an obligation on the state to disclose exculpatory evidence to the defense, courts consistently have determined that this duty falls squarely on the prosecutor, not the police." *Id.* at

377.  Yet, the court noted, this does not mean that the police play no role in ensuring that the state satisfies its *Brady* obligations or cannot violate a defendant's constitutional rights if they conceal exculpatory evidence.  *Id.* at 378.  The Court held that because police officers play an integral role in ensuring that the state complies with *Brady*, a police officer can be held liable for suppressing exculpatory information.  *Id.* at 381.  Liability may be imposed without a showing of bad faith, however, only where the exculpatory value of the evidence at issue is "apparent."  *Id.* at 387-89.

### *Detective Young's Report*

Before turning to whether a *Brady* violation occurred, the Court addresses Bahl's argument in the qualified immunity portion of his brief that a reasonable police officer could have concluded that Detective Young's report and opinion was not "patently exculpatory."  Bahl argues that a reasonable official could have concluded that Detective Young's report was not *Brady* material because Detective Young told Bahl that the calculations in his report were not necessarily accurate and Detective Young could not prove them.  Bahl argues that based upon Detective Young's agreement that his work was not necessarily accurate, a reasonable official could have concluded that Detective Young's report was not exculpatory material that should have been turned over to the defense.

The Court takes a different view of Detective Young's report and the other evidence in the record.  In the Court's judgment, the videotape of Camera 7 (showing McCollum in the lobby of the TLC Building), even without the benefit of Detective Young's analysis, is itself exculpatory because it tends to show that McCollum did not, and could not have, committed the murder.  That videotape, which the Court has reviewed in its entirety, shows McCollum sitting in the south lobby of the TLC Building for an extended period of time.  McCollum is seen entering the lobby, sitting down in a chair in the corner, and apparently falling asleep.  Significantly, this is consistent with what

12

McCollum told Bahl in the initial interview. While it is true that the tape contains no time stamp, it nonetheless contains a reliable indicator of the time McCollum was in the lobby. That is, when McCollum first enters and sits down, it is dark outside the entrance doors, but as time passes, the darkness turns to light, which continually grows brighter. That day, January 23, 2005, the sun rose at 8:01 a.m.,[5] (Young Dep. at 708-09), and McCollum is shown in the lobby both before and for a substantial time after the sun comes up.[6] Of course, because the tape is recorded in elapsed time, there are gaps where McCollum theoretically could have been absent. Even so, he is always present. Furthermore, when the nature of the crime is considered – a brutal rape and murder by strangulation with a large amount of blood – it is striking that McCollum's demeanor and physical appearance are totally inconsistent with what one would expect from someone that had just committed such violent and gruesome acts.

Detective Young's report and conclusions not only bolster the exculpatory nature of the video evidence, but in combination with the video evidence exonerate McCollum.[7] Contrary to Bahl's assertions, Detective Young never questioned the reliability or accuracy of his own work, but instead confirmed that his work and calculations were very reliable. (*Id.* at 679.) Young testified that he "never said that [his opinions and conclusions] were of no value," (*id.*), and he never questioned the accuracy of the frames identified for the 7:41 and 9:41 a.m. exit and reentry times.

---

[5] Courts may take judicial notice of the time of sunrise and sunset. *See Davis v. Freels*, 583 F.2d 337, 339 n.2 (7th Cir. 1978) ("We take judicial notice that sunrise was at 6:15 A.M. on that date in Chicago."); *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) (noting that the types of things about which courts may ordinarily take judicial notice include the time of sunrise or sunset).

[6] Detective Young testified that the change in lighting showed that his analysis could not have been off due to Daylight Savings Time because if the times were off an hour one way it would have been dark and if they were off an hour the other way it would have been light. (Young Dep. at 709-10.)

[7] Detective Young's report is the type of evidence that would support a claim of actual innocence sufficient to overcome procedural default in a habeas corpus proceeding under 28 U.S.C. § 2254. *See Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 866 (1995) (describing types of evidence that can support claims of actual innocence).

(*Id.* at 680.)  Rather, any concern that he had about accuracy went to the information he was provided, which he did not verify on his own.  However, nothing in the record shows that any of the information Detective Young received from Bahl has ever been proven inaccurate or unreliable.

Having concluded that Detective Young's written report, as well as the oral information that he conveyed to Bahl during the March 28, 2005, meeting, was *Brady* material, the Court next considers whether Bahl committed a *Brady* violation.  While factual disputes remain regarding whether Detective Young gave a copy of his report to Bahl and whether Bahl provided the report to assistant prosecutor Matwiejczyk prior to trial, it is undisputed that Detective Young gave a copy of his report to Matwiejczyk at trial.  This fact negates any *Brady* claim that McCollum might have against Bahl because once Matwiejczyk had the report, it was his sole obligation to ensure that defense counsel received a copy.  Even though a dispute of fact exists with regard to whether McCollum's counsel, Taylor, was given a copy of the report at trial, that dispute is immaterial to a *Brady* claim against Bahl because there is no question that the prosecutor had the report in time to produce it to defense counsel. *See Hatchett v. City of Detroit*, No. 08-CV-11864, 2010 WL 538648, at *10 (E.D. Mich. Feb. 10, 2010) (holding that even if the defendant police officer concealed DNA test results he could not have violated *Brady* because, as the plaintiff admitted, the prosecutor had already received the test results from another source).  Thus, Bahl is entitled to summary judgment on McCollum's *Brady* claim based upon the failure to disclose Detective Young's report.

The Sixth Circuit has recognized that delayed disclosure can, under some circumstances, violate *Brady*.

> To demonstrate the type of materiality, and, thus, prejudice necessary to establish a *Brady* violation based upon delayed disclosure, a defendant must show what he would have done differently had he been given more time to address the *Brady* evidence, and specifically how, had the evidence been given to the defendant earlier, a reasonable probability exists that the result of the defendant's trial would have been different.

14

*United States v. Spry*, 238 F. App'x 142, 147-48 (6th Cir. 2007). McCollum does not expressly argue delayed disclosure, but even if he did, the argument would lack merit. If Taylor had in fact received the report at trial, he would have had sufficient time to review it and seek a continuance from the trial court, but he did not do so. Moreover, as noted above, Taylor already had a copy of the videotape and would have been sufficiently familiar with the subject of the report to make proper use of it.

### Information Omitted from Original Tapes

McCollum also contends that the information Bahl omitted from the labels on the tapes Detective Young prepared was exculpatory and that Bahl violated *Brady* by not providing it on the copies of the videotapes furnished to the prosecutor and defense counsel. While the Court agrees that the information was exculpatory, it concludes that Bahl did not violate *Brady* for the reasons discussed above. More specifically, Detective Young's report contained the same information omitted from the original videotapes and would have given McCollum's counsel all of the pertinent information. Again, because Detective Young gave a copy of his report to Matwiejczyk at trial, Bahl cannot be held liable for violating *Brady*.

### Undisclosed Murder Time Frame

McCollum argues in his brief for the first time in this case that Bahl violated *Brady* by not disclosing that the murder time was actually before 7:30. a.m. This argument is without merit because it is based solely upon Bahl's and Chief Imeson's speculation that the murder occurred before 7:30. Bahl's and/or Chief Imeson's opinion regarding the time of the murder is mere speculation and conjecture without any evidentiary support. Whatever Bahl and Chief Imeson may have believed about the time of the murder is not evidence and is totally inconsistent with the

evidence presented at trial. Therefore, Bahl's failure to disclose his opinion was not a *Brady* violation.

In sum, Bahl is entitled to summary judgment on McCollum's *Brady* claims. Thus, the Court need not reach Bahl's qualified immunity argument.

### b.    Fabrication of Evidence

The Sixth Circuit has held that a police officer violates an individual's due process rights if "he knowingly fabricated evidence . . . and . . . there is a reasonable likelihood that the false evidence could have affected the judgment of the jury." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997). McCollum alleges that Bahl violated his rights by fabricating his confession and by mishandling the purple fiber evidence.

### *The Confession*

McCollum argues that Bahl fabricated his confession by essentially priming him with incriminating details of the murder during the interview at LCC and then allowing McCollum to disclose those details in the interview with Detective Lankheet, who was unaware that Bahl had tainted McCollum with such details.

Bahl argues that McCollum's claim fails because neither Michigan nor federal law requires that a confession be suppressed if it was not electronically recorded and because McCollum fails to address any of the factors bearing upon whether his confession was coerced. *See Jackson v. McKee*, 525 F.3d 430, 433-34 (6th Cir. 2008) (citing factors for determining whether confession was coerced). As the Court understands McCollum's claim, however, he is not alleging that his confession was coerced or that it was invalid because it was not electronically recorded. Rather, McCollum is alleging that Bahl fabricated McCollum's confession by feeding him details of the crime, which McCollum later repeated to Detective Lankheet, while Bahl failed to disclose that he

had provided these details to McCollum. *See Washington v. Buraker*, No. Civ A 302CV00106, 2006 WL 759675 (W.D. Va. Mar. 23, 2006) (denying the defendant's motion for summary judgment on the plaintiff's claim that the defendant fabricated his confession by feeding the plaintiff non-public details of the crime and then representing that the plaintiff had volunteered such information during the interrogation). McCollum has presented sufficient evidence to support such a claim, including his own affidavit in which he claims that Bahl primed him with nonpublic details of the crime. (McCollum Aff. ¶ 7.) Bahl offers no evidence refuting McCollum's statements, nor has he offered any persuasive reason why summary judgment should be granted on McCollum's fabrication claim.

### *Purple Fiber Evidence*

McCollum also references Bahl's mishandling of purple fiber evidence. McCollum suggests, although does not explicitly state, that Bahl may have fabricated evidence that purple fibers from Kronenberg's purple sweater were found on the clothes McCollum was wearing the day he was arrested (which were not the clothes he wore the day of the murder). Assuming that McCollum is alleging a fabrication of evidence claim, his claim fails because there is no evidence in the record, indeed, not even a mention in his brief, that such evidence was used to convict him. Therefore, McCollum has failed to show a reasonable likelihood that the purple fiber evidence affected the jury's verdict.

### c.    Continued Detention Without Probable Cause

As noted above, McCollum also alleges that Bahl violated his Fourth Amendment rights by continuing to detain him without probable cause. Specifically, McCollum alleges that probable cause ceased to exist once Bahl learned of Detective Young's report and conclusions. McCollum alleges that had the report been disclosed at or prior to the preliminary examination, there would have been no probable cause for his continued arrest, incarceration, and prosecution. The Sixth

Circuit discussed such a claim in *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006), as arising under the Fourth Amendment. *See id.* at 750-51. The court distinguished a continued detention claim from a *Brady* claim, which alleges a due process violation. *Id.* at 750. Although recognizing the distinct bases of each type of claim, the court observed that the same evidence, e.g., failure to disclose exculpatory evidence, may support both types of claims. *Id.*

Bahl did not move for summary judgment on this claim. Rather, Bahl moved for summary judgment only on McCollum's due process *Brady* claim. Nonetheless, the Court notes that the Second Amended Complaint sufficiently alleges a Fourth Amendment claim based upon continued detention without probable cause. Because Bahl failed to move for summary judgment on this claim, and there is evidence in the record to support this claim, the continued detention claim remains for trial.

## 2. State Law Claims

### *False Arrest and Imprisonment*

Bahl contends that he is entitled to summary judgment on McCollum's claims of false arrest and false imprisonment because McCollum was bound over for trial after a preliminary examination, which conclusively establishes probable cause. In order to prevail on a claim of false arrest or false imprisonment, a plaintiff must show a lack of probable cause. *Burns v. Olde Discount Corp.*, 212 Mich. App. 576, 581, 538 N.W.2d 686, 688 (1995).

Bahl cites *Smith v. Thornburg*, 136 F.3d 1070 (6th Cir. 1998), for the proposition that the trial court's prior finding of probable cause following the preliminary examination conclusively establishes probable cause. In *Smith*, the court stated:

> The law of our Circuit provides that where the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action.

*Id.* at 1077 (quotations omitted) (citing *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987), *overruled on other grounds by Frantz v. Vill. of Bradford*, 245 F.3d 869, 874 (6th Cir. 2001)). The claim in *Smith* was a malicious prosecution claim under § 1983. Nonetheless, Michigan courts apply the same rule of collateral estoppel to state law claims. *See Webb v. City of Taylor*, No. 236153, 2002 WL 31947931, at *3-4 (Mich. Ct. App. Dec. 3, 2002). In *Darrah v. City of Oak Park* 255 F.3d 301 (6th Cir. 2001), the plaintiff alleged that a police officer made materially false statements to the state judge, which formed the basis of that court's probable cause determination. The Sixth Circuit concluded that collateral estoppel did not bar the claim because the identity of issues requirement under Michigan law was not satisfied. *Id.* at 311. The court reasoned that the plaintiff was not attempting to relitigate the probable cause finding, but instead was arguing that the officer made materially false statements to the judge that supported probable cause. *Id.* McCollum's claims in this case are similar to the claim of the plaintiff in *Darrah*, in that McCollum alleges that Bahl fabricated McCollum's confession and used the confession to support a probable cause determination at the preliminary examination by testifying about how it fit with his theory of the case. Moreover, McCollum alleges that Bahl failed to disclose exculpatory evidence that would have vitiated probable cause. Therefore, Bahl's motion will be denied on these claims.

### *Malicious Prosecution*

Bahl next argues that he is entitled to summary judgment on McCollum's malicious prosecution claim because Michigan law does not recognize a claim based upon the police failing to disclose exculpatory information. In *Payton v. City of Detroit*, 211 Mich. App. 375, 536 N.W.2d 233 (1995), the court observed that "[f]ailure to include all exculpatory facts is not adequate to sustain a suit for malicious prosecution." *Id.* at 395, 536 N.W.2d at 242. The court noted that the defendants in that case could not be liable for malicious prosecution because they attended meetings

with members of the prosecutor's office and made full and fair disclosure to the prosecutor's office regarding all material facts within their knowledge. *Id.* at 395, 536 N.W.2d at 243.

Contrary to Bahl's argument, Michigan courts do recognize claims for malicious prosecution based upon a failure to disclose exculpatory evidence in some circumstances. In *Flones v. Dalman*, 199 Mich. App. 396, 502 N.W.2d 725 (1993), the court recognized that "an officer who merely executes a warrant that is valid on its face is protected from liability." *Id.* at 404, 502 N.W.2d at 729 (citing *Belt v. Ritter*, 18 Mich. App. 495, 499, 171 N.W.2d 581, 583-84 (1969)). Yet, the court held that the plaintiff had a valid claim against the defendant, who did not participate in the arrest, because the defendant failed to investigate the plaintiff's exculpatory explanation or mention it to his sergeant. Moreover, the defendant officer supplied the information that provided probable cause for the warrant. The court held that "[a] police officer is not shielded from liability by a warrant where, because of the officer's failure to investigate or disclose exculpatory information, probable cause for the issuance of the warrant may have been lacking." *Id.* Here, as in *Dalman*, McCollum has presented evidence that Bahl withheld exculpatory evidence which would not merely have been helpful to the defense, but which would have negated probable cause. Therefore, Bahl's motion will be denied with regard to this claim.

### *Intentional Infliction of Emotional Distress*

In order to state a claim for intentional infliction of emotional distress, a plaintiff must prove: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Hayley v. Allstate Ins. Co.*, 262 Mich. App. 571, 577, 686 N.W.2d 273, 276 (2004). Regarding the first element, the offending conduct must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious and utterly intolerable in a civilized community." *Id.* (quoting *Graham v. Ford*, 237 Mich. App. 670, 674, 604 N.W.2d 713, 716 (1999)).

Bahl argues that he is entitled to summary judgment because his actions merely show a good faith disagreement with Detective Young's opinions – conduct that cannot be considered as going beyond all possible bounds of decency as a matter of law. The Court disagrees. Although Bahl characterizes his actions as simply a disagreement with Detective Young's opinions, there is more than sufficient evidence to show that Bahl not only ignored, but hid, substantial evidence showing that McCollum was sleeping in the lobby of the TLC Building during the entire murder time frame, just as McCollum had said during the first interview with Bahl. While Bahl claims that he did his own calculations that disagreed with Detective Young's conclusions and that an LCC math professor discredited Young's work, McCollum has presented evidence to discredit such claims. Summary judgment will also be denied on this claim.

### *Abuse of Process*

"To recover upon a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose, and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc*, 412 Mich. 1, 30, 312 N.W.2d 585, 594 (1981) (citing *Spear v. Pendill*, 164 Mich. 620, 623, 130 N.W. 343, 344 (1911)). A meritorious abuse of process claim occurs in "a situation where the defendant has used a proper legal procedure for a purpose collateral to the intended use of that procedure." *Bonner v. Chicago Title Ins. Co.*, 194 Mich. App. 462, 472, 487 N.W.2d 807, 812 (1992). Bahl is entitled to summary judgment on the abuse of process claim because McCollum cannot show, and has offered no evidence, that Bahl intended to obtain a criminal conviction for a purpose collateral to the intended use of the process. Therefore, this claim will be dismissed.

*Gross Negligence*

Bahl finally argues that McCollum's gross negligence claim must be dismissed because it simply attempts to recast intentional conduct as a negligence claim. Michigan courts have held that a plaintiff may not transform claims involving elements of intentional torts into claims of gross negligence. *See Van Porous v. Burmeisteri*, 262 Mich. App. 467, 483, 687 N.W.2d 132, 143 (2004) ("[This Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence."). However, in *McGuire v. City of Royal Oak*, 295 F. App'x 736 (6th Cir. 2008), the Sixth Circuit allowed the plaintiff's gross negligence claim to proceed, even though he also alleged claims for malicious prosecution and intentional infliction of emotional distress. The plaintiffs alleged that the defendant officers fabricated evidence and manufactured probable cause. *See id.* at 739. The court concluded that there was ample evidence that the defendants acted with gross negligence by singling out the plaintiffs and furthering their prosecution when the defendant officers did not know the identity of the assailants yet repeatedly testified against the plaintiffs. *Id.* at 740. As in *McGuire*, McCollum has presented ample evidence that Bahl acted with gross negligence by continuing his incarceration and prosecution in the face of Detective Young's report. Viewed in a light most favorable to McCollum, this evidence is sufficient to permit a reasonable jury to conclude that Bahl's conduct was "'so reckless as to demonstrate a substantial lack of concern for whether an injury results.'" *Id.* at 739 (quoting M.C.L.A. § 691.1407(7)(a)). Therefore, this claim may proceed.

**B.    McCollum's Motion for Summary Judgment**

McCollum did not file a motion for summary judgment, but in his brief in response to Bahl's motion, McCollum states that he is entitled to partial summary judgment. (Pl.'s Resp. Br. at 23.) Because McCollum's request for summary judgment is based solely upon the *Brady* claims, which

the Court has already concluded are subject to dismissal, the Court will deny McCollum's motion for partial summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Bahl summary judgment on McCollum's § 1983 claims alleging *Brady* violations and the purple fiber evidence fabrication claim. The Court will also grant the motion on the state law abuse of process claim. The motion will be denied with regard to the § 1983 claims that Bahl fabricated McCollum's confession and improperly continued to detain McCollum and with regard to the state law claims of false arrest and imprisonment, malicious prosecution, intentional infliction of emotional distress, and gross negligence. Finally, the Court will deny McCollum's motion for partial summary judgment.

An Order consistent with this Opinion will be entered.


Dated:  May 3, 2010                                    _____/s/ Gordon J. Quist_____
                                                                            GORDON J. QUIST
                                                                            UNITED STATES DISTRICT JUDGE